Carlo MATULICH, Plaintiff
Below, Appellant,

v.

**AEGIS COMMUNICATIONS GROUP, INC., World Focus, Essar Investments Limited, Anshuman Ruia, Pramod Saxena, Rajiv Agarwal, Kannan Ramasamy, Madhu Vuppuluri, Richard Ferry, John–Michael Lind, Rashesh Shah, and Kamalnayan Agarwal, Defendants Below, Appellees.**

No. 279, 2007.

Supreme Court of Delaware.

Submitted: Dec. 12, 2007.
Decided: Jan. 15, 2008.

---

Ronald A. Brown, Jr., Esquire, Prickett, Jones & Elliott, P.A., Wilmington, Delaware, for appellant.

Daniel A. Dreisbach, Esquire (argued), Daniel M. Silver, Esquire, and Harry Tashjian, IV, Esquire, Richards, Layton & Finger, Wilmington, Delaware, and Perry A. Pappas, Esquire, Morris, Cohen, LLP, New York, New York, for defendants World Focus and Essar Investments Limited.

R. Judson Scaggs, Jr., Esquire and Kevin M. Coen, Esquire, Morris, Nichol, Arsht & Tunnell, Wilmington, Delaware, for defendants, Aegis Communications Group, Inc., Anshuman Ruia, Pramod Saxena, Rajiv Agarwal, Kannan Ramasamy, Madhu Vuppuluri, Richard Ferry, John–Michael Lind, Rashesh Shah and Kamalnayan Agarwal.

Before STEELE, Chief Justice, HOLLAND and BERGER, Justices.

HOLLAND, Justice.

This is an appeal from a final judgment entered by the Court of Chancery after it granted a Rule 12(b)(6) motion to dismiss. The Complaint alleges that the plaintiff-appellant, Carlo Matulich ("Matulich"), is a former holder of Aegis common stock. Aegis is a Delaware corporation which provides multi-channel customer relationship management outsourcing services. Aegis is alleged to be directly and wholly owned by the defendant, World Focus, and indirectly by the defendant, Essar Investments Limited ("Essar"), which is alleged to control World Focus. The remaining named defendants are alleged to be current or former directors of Aegis.

This appeal involves the Court of Chancery's interpretation of a Certificate of Designation, which delineates the rights, preferences, limitations and restrictions of the Series B Preferred Stock. Matulich's sole argument on appeal is that the Series B Preferred Stock had the statutory right to vote on any merger. The Court of Chancery held that, as a matter of law, the holders of Series B Preferred Stock did not have the statutory right to vote on any mergers, but instead had only a distinguishable contractual right to approve of and consent to mergers. We have concluded that the Court of Chancery's judgment must be affirmed.

### Facts

In the summer of 2006, World Focus decided to take Aegis private by consummating a short-form merger (the "Merger"). At the time of the Merger, Aegis had only two classes of stock outstanding, Common Stock and Series B Preferred Stock. World Focus held approximately 94.84% of Aegis outstanding Common Stock.

In the mid–1990's, all but 29,778 shares of Series B Preferred Stock were convert-ed into Common Stock. On the books of Aegis, Freiburghaus is the record holder of the 29,778 shares of Series B Preferred Stock that remain outstanding. Freiburghaus, however, has been liquidated and its assets have been distributed. All efforts to locate the present holder of the Series B Preferred Stock, have been unsuccessful.

Because the Series B Preferred Stock had a right to approve of and consent to any merger and the identity of the current holder of the Series B Preferred Stock was unknown, consummating the Merger required equitable relief. Therefore, World Focus filed a Petition for Equitable Relief with the Court of Chancery. The description of the equitable relief sought in the Petition tracks the language contained in the Series B Certificate of Designation. The Petition requested a declaration that the holder of the Series B Preferred Stock had approved and consented to the Merger, if the holder of the outstanding Series B Preferred Stock did not come forward after notice was published.

The Court of Chancery ordered World Focus to attempt to notify the holders of the Series B Preferred Stock by placing notices in two European newspapers. World Focus complied with that order, but no holder of Series B Preferred Stock came forward. The Court of Chancery entered a final order on October 26, 2006 deeming the holder of the Series B Preferred Stock to have consented to and approved of the merger. World Focus consummated a short-form merger on November 3, 2006.

### Complaint Dismissed

After the Merger was consummated and the time period to seek appraisal had expired, Matulich filed a Complaint in the Court of Chancery. Matulich owns no Series B shares. He is a former minority

holder of Common Stock who is unhappy with the short-form merger consideration.

Matulich does not challenge the decision of the Court of Chancery to deem the Series B shareholders to have approved the Merger. Rather, Matulich contends that the right of approval and consent held by Series B shareholders constitutes a statutory right to vote on the merger. If the Series B shareholders possessed such a right, then World Focus could not have executed a short-form merger, because it owned less than the 90% of outstanding Series B shares as required by that statutory provision.[1] Whether a controlling stockholder has the right to implement a short-form merger is of great significance to the minority stockholders because, if a controlling stockholder meets the statutory prerequisites to effect a short-form merger and does so, the controlling stockholder does not have to establish the entire fairness of the merger.[2]

The defendants moved to dismiss the Complaint for failure to state a claim and asserted that the short-form Merger was validly effected under section 253 of the Delaware General Corporation Law ("DGCL"). In opposing that motion, Matulich argued that the contractual right to approve of or consent to a merger found in the Series B Preferred Stock Certificate of Designation was analytically indistinguishable from a statutory voting right. Therefore, because World Focus did not own 90% or more of the Series B Preferred Stock, Matulich contended that it could not execute a section 253 short-form merger.

The Court of Chancery rejected Matulich's argument that the Series B Pre-

ferred Stock had the statutory right to vote on the Merger. It held that the Certificate of Designation unambiguously denied the holder of the Series B Preferred Stock the statutory right to vote on any merger. Accordingly, Matulich's Complaint was dismissed under Court of Chancery Rule 12(b)(6) for failure to state a claim.

### Preferred Stock Contracts

Section 151(a) of the DGCL affords Delaware corporations the ability to provide for the flexible financing that is necessary to meet the unique funding needs of the enterprise and the requirements of diverse investors in today's competitive global capital markets. Section 151(a) provides:

> Every corporation may issue one or more classes of stock * * * any or all of which classes * * * may have such voting powers, full or limited, or no voting powers, and such designations, preferences and relative, participating, optional or other special rights, and qualifications, limitations or restrictions thereof, as shall be stated and expressed in the certificate of incorporation or of any amendment thereto, or in the resolution or resolutions providing for the issue of such stock adopted by the board of directors pursuant to authority expressly vested in it by provisions of its certificate of incorporation. * * * [3]

Delineating the specific rights and limitations of preferred shareholders is the function of corporate drafters.[4] Section 151(a) has been described by one legal scholar as:

> hand[ing] the drafter of the corporate charter a blank slate on which to fill in

1. Del.Code Ann. tit. 8, § 253.

2. *Glassman v. Unocal Exploration Corp.*, 777 A.2d 242, 248 (Del.2001).

3. Del.Code Ann. tit. 8, § 151(a).

4. *Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 852 (Del.1998). *See also* Richard M. Buxbaum, *Preferred Stock and Draftsmanship*, 42 Cal. L.Rev. 243, 303 (1954).

the rights of different classes of equity participants—rights which by definition concern periodic returns, capital payouts on (or prior to) liquidation, and voting. On the blank slate the drafter may parse those rights among multiple classes of stock as he or she sees fit. To be "preferred" stock is to be a class of stock with a "preference" or "special right" as against another class of stock, with the preference or right going to periodic returns, capital payouts, or both.[5]

Accordingly, the special rights and limitations of preferred stock are created by the corporate charter or a certificate of designation, which acts as an amendment to a certificate of incorporation.[6] Consequently, rights of preferred shareholders are primarily contractual in nature.[7] The construction of preferred stock provisions are matters of contract interpretation for the courts.[8]

### Series B Preferred Stock

The contract at issue in this appeal is the Certificate of Designation for the Series B Preferred Stock. The rules of construction which are used to interpret contracts and other written instruments are applicable when construing corporate charters and certificates of designation.[9] The starting point in construing any contract is to determine whether a provision is ambiguous, *i.e.*, whether it is *reasonably* subject to more than one interpretation.[10]

Contract language "is not rendered ambiguous simply because the parties in litigation differ concerning its meaning."[11] A contract is ambiguous "only when the provisions in controversy are *reasonably* or fairly susceptible of different interpretations or may have two or more different meanings."[12] If there is no ambiguity, a court "must give effect to the clear language" of the certificate of designation.[13]

If a certificate of designation is silent as to voting rights, preferred shareholders have the same statutory rights as common stockholders.[14] Voting rights may only be derogated, in whole or in part, by a clear and express statement.[15] This Court has stated:

**5.** William W. Bratton, *Corporate Finance* 486 (6th ed.2008).

**6.** *Id.*

**7.** *Harbinger Capital Partners Master Fund I, Ltd. v. Granite Broadcasting Corp.*, 906 A.2d 218, 224 (Del.Ch.2006) (quoting *HB Korenvaes Inv., L.P. v. Marriott Corp.*, 1993 WL 205040, at *18 (Del.Ch. June 9, 1993)).

**8.** *Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d at 852.

**9.** *See Hibbert v. Hollywood Park, Inc.*, 457 A.2d 339, 342–43 (Del.1983).

**10.** *Appriva Shareholder Litigation Co., LLC, et al. v. EV3, Inc.*, 937 A.2d 1275 (Del.2007). *See Eagle v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del.1997); *Klair v. Reese*, 531 A.2d 219, 223 (Del.1987).

**11.** *City Investing Co. Liquidating Trust v. Continental Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993).

**12.** `Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992); *see also Kaiser Aluminum Corp. v. Matheson*, 681 A.2d 392, 395 (Del.1996). *AT & T Corp. v. Faraday Capital Ltd.*, 918 A.2d 1104, 1108 (Del.2007) (citing *Northwestern Nat'l Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 43 (Del.1996)).

**13.** *Kaiser Aluminum Corp. v. Matheson*, 681 A.2d 392, 395 (Del.1996).

**14.** *See Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584, 593–94 (Del.Ch.1986).

**15.** *Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 852–53 (Del.1998). *See* Richard M. Buxbaum, *The Internal Division of Powers in Corporate Governance*, 73 Cal. L.Rev. 1671,

Any rights, preferences and limitations of preferred stock that distinguish that stock from common stock must be expressly and clearly stated, as provided by statute. Therefore, these rights, preferences and limitations will not be presumed or implied.[16]

 The issue of voting rights is addressed by the Certificate of Designation for the Series B Preferred Stock, which provided that the holders of Series B Preferred Stock had *"no voting rights."* It stated in pertinent part:

(B) The holders of shares of Series B Preferred Stock are subject to the following qualifications, limitations and restrictions:

(i) *no voting rights;*

(ii) except as provided in (A)(vi) above, no right of consent to or approval of, except, as may then be required by law, prior to or upon amendment of or repeal of provisions attaching to the Series B Preferred Stock[.]

The only right granted to the holders of the Series B Preferred Stock with respect to a merger was the right of approval and consent set forth in paragraph A(vi)(d). Section A(vi)(d) of the Series B Certificate of Designation provides:

(A) Shares of Series B Preferred Stock shall entitle their registered owners to the following preferences and rights . . .

(vi) right of approval and consent (represented by the consent of the majority of the Series B Preferred

Stock then outstanding) prior to any of the following events . . .

(d) merger or consolidation of [Aegis] with any other entity or sale of all or substantially all the assets of the Corporation.

Matulich contends that the provisions of the Certificate of Designation providing a contractual right of "approval and consent" is legally synonymous with the statutory right to "vote" provided for in the DGCL. That contention is not supported by the document. Section B in the Certificate of Designation expressly recognizes that the *statutory* right to vote being denied is different and distinct from the *contractual* consent and approval right that was conferred in Section (A)(vi). The Series B Preferred Shareholders were denied the statutory right to vote on a merger but were provided with a contractual "blocking" right to prevent a merger if they refused to give their approval and consent.

### *Voting Rights Withheld*

 If a corporation organizes itself within the boundaries of Delaware statutory law, it is given great flexibility in demarcating the rights and limitations of shareholders, particularly those of preferred shareholders, through private agreement.[17] We have concluded there is no legal impediment to giving Series B shareholders a *contractual* right of approval and consent to a merger, but no *statutory* right to vote on a merger itself.[18] Written in the disjunctive, section 212(b) of the DGCL provides that a shareholder

1684 (1985) ("Whatever its attributes . . . preferred stock is quintessentially a matter of contract. If any deviation from the attributes of the residual common stock concept is desired, the contract must specify it.").

**16.** *Elliott Assocs., L.P. v. Avatex Corp.,* 715 A.2d at 852–53 (citing Del.Code Ann. tit. 8,

§ 151(a); *Rothschild Int'l Corp. v. Liggett Group, Inc.,* 474 A.2d 133, 136 (Del.1984)).

**17.** *Elliott Assocs., L.P. v. Avatex Corp.,* 715 A.2d 843 (Del.1998).

**18.** *Id.*

may be granted multiple methods by which they may express an opinion:

> "Each stockholder entitled to vote at a meeting of stockholders *or* to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act for such stockholder by proxy...."[19]

Section 212(b) recognizes that a shareholder may be entitled to "express consent or dissent," without possessing a right to vote.

Section 253 implicates only the right to *vote* on a merger, as opposed to a right to consent or approve. Section 253 of the DGCL states that a parent corporation must own at least 90% of each class of stock entitled to "vote on such merger."[20] Inherent in the language of section 253 is the recognition that there can be and are classes of stock which are not entitled to vote on a merger.

The Court of Chancery held that the Certificate of Designation, read as a whole and giving meaning to each provision, specifically limits the rights of the holders of Series B Preferred Stock by expressly denying them any statutory right to "vote," but granting those preferred shareholders a contractual right of approval and consent prior to the consummation of a merger. We agree. The contractual "blocking" right that was conferred and the statutory voting rights that were withheld are different. Even if the Series B Preferred shareholders expressed their contractual right to "consent and approve" a merger in the form of a vote, an exercise of that contractual right in a voting format is legally distinct from the statutory right to vote on the merger that was denied.

There is no ambiguity in the language of the Series B Preferred Stock Certificate of Designation. The Series B shares possess no statutory voting rights, but do have a contractual right to consent and approve. We hold that Series B shareholders' contractual right to consent and approve does not constitute a statutory right to vote on the merger. Therefore, the Court of Chancery properly concluded that the contractual rights of the Series B Preferred Shareholders were irrelevant in calculating whether World Focus had the statutory voting power necessary to execute a short-form merger. Consequently, as a matter of law, Matulich's challenge to the Merger is without merit.

### *Conclusion*

The Court of Chancery properly granted the defendants' Rule 12(b)(6) motion to dismiss. The judgment of the Court of Chancery is affirmed.

---

**19.** Del.Code Ann. tit. 8, § 212(b) (emphasis added).

**20.** Delaware's short-form merger statute, in relevant part, provides that:

> In any case in which at least 90% of the outstanding shares of each class of the stock of a corporation or corporations ... of which *class* there are outstanding shares that, absent this subsection, would *be entitled to vote on such merger*, is owned by another corporation ... the corporation having such stock ownership may either merge the other corporation or corporations into itself ... [or merge itself into the other corporation].

Del.Code Ann. tit. 8, § 253 (emphasis added).